United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 21, 2005**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 03-41380
_____

ANDREW PLOTKIN, as Trustee for Zachary S. Plotkin Trust
dated 12/17/95; ANDREW PLOTKIN, as Trustee for
Natalie R. Plotkin Trust dated 12/17/95;
ROBERT PLOTKIN, as Beneficiary of Robert Plotkin IRA;
ROBERT PLOTKIN IRA ROLLOVER DATED 11/10/99;
ROBERT PLOTKIN; NANCY PLOTKIN; MANUEL PLOTKIN,

Plaintiffs - Appellants,

versus

IP AXESS INC., ETC.; ET AL.,

Defendants,

MICHAEL A. McDONNELL; JAMES G. SCOGIN,

Defendants-Appellees.

_____

Appeal from the United States District Court
For the Eastern District of Texas
_____

Before JONES, SMITH, and STEWART, Circuit Judges.

EDITH H. JONES, Circuit Judge:

In this appeal, we review the district court's dismissal

with prejudice of a securities fraud complaint filed by Robert

Plotkin and members of his family (collectively "Plotkin") against

IPaxess, Inc. ("IPaxess") and two of its officers, Michael A.

McDonnell ("McDonnell") and James G. Scogin ("Scogin"). Plotkin's

complaint alleges that the defendants committed securities fraud

under federal and Illinois laws by making false or misleading statements in press releases, and that Plotkin purchased common stock in IPaxess based on these statements. The district court dismissed the complaint for failure to state a claim upon which relief can be granted. For the reasons stated below, we AFFIRM IN PART, REVERSE IN PART, and REMAND.

## I. BACKGROUND

From the late 1990s to 2001, Data Race, Inc. d/b/a IPaxess, was a fledgling technology company with executive offices in Plano, Texas. The company's principal business was the design, manufacture and marketing of communication products enabling remote access to all elements of corporate communications networks, including the Internet and Intranet. IPaxess's lead product for purposes of this suit was the VocalWare IP remote access system. Throughout the relevant period, defendant McDonnell served as the Chief Operating Officer, President, Chief Executive Officer and Director of the company, while Scogin was its Controller, Senior Vice President-Finance, Chief Financial Officer, Secretary and Treasurer. Scogin also apparently served as the Company's Investor Relations Officer.

According to Plotkin's Second Amended Complaint (the "Complaint"), IPaxess struggled financially before the events in question: Revenues decreased from approximately $1.9 million in its 1998 fiscal year to approximately $800,000 in 1999 and only

2

$316,000 for 2000.  The Complaint goes on to allege that, during much of 2000, the defendants carried out a campaign to attract new investors in the company's common stock and to persuade existing investors to increase their holdings.  The campaign allegedly proceeded with the issuance of several false and misleading press releases that induced Plotkin to purchase considerable amounts of IPaxess stock.  He bought stock for himself and family members following two press releases issued on May 25, 2000, and one on August 18, 2000.[1]  This case centers around the three press releases.

## 1.   May 25 Releases

In the May 25 press releases, IPaxess announced a letter of intent and a purchase order involving IPaxess, Associated Global Partners ("AGPI"), and Lynxus, Inc. ("Lynxus").  The first press release stated, in relevant part:

> IPaxess, formerly DATA RACE, Inc. (Nasdaq: RACE) today announced a letter of intent to enter into a strategic partnership with Associated Global Partners/Lynxus, Inc. (AGPI/Lynxus).
>
> *          *          *
>
> Under terms of the agreement AGPI and Lynxus Inc. will be granted exclusive international marketing rights for IPaxess products for all business associated with the IP education solution opportunities in any country in which they are actively engaged in business partnerships.  The

---

[1]     In reliance on the two May 25 releases, Plotkin purchased, for himself and for the other plaintiffs, 68,800 shares of the company's stock at a cost of $393,439.25.  In reliance on the August 18 press release, the plaintiffs made their final purchases of the company's stock:  13,300 shares at a total cost of $80,323.76.

agreement calls for an annual commitment of $25 million of net purchases from IPaxess.

> "Going forward, this strategic relationship with AGPI/Lynxus represents an important component of IPaxess's worldwide distribution strategy, and will enable us to expand our market opportunity by delivering the VocalWare IP technology to a broader range of customers," stated IPaxess President and CEO, Michael McDonnell. "AGPI/Lynxus's decision to market VocalWare IP as a best-of-breed solution confirms that IPaxess is on the way to becoming a recognized leader in remote communications technology."

In the second May 25 press release, IPaxess announced that it had received a multimillion dollar purchase order from AGPI/Lynxus:

> IPaxess, formerly DATA RACE, Inc. (Nasdaq: RACE) today announced receipt of a $6.5 million purchase order for the VocalWare IP remote work technology from AGPI/Lynxus, Inc., an application service provider which supplies internet access solutions to businesses, schools, churches and homes.

The releases also described the operations of IPaxess's new customers and announced the companies' contributions to the planned joint undertakings:

> With current or developing operations in Latin America, Africa, Asia and the Middle East, AGPI is rapidly becoming a leading provider of telecommunications transport services, with networks designed to complement existing global carrier networks. Lynxus, Inc. (www.lynxus.com) is one of North America's fastest growing enhanced application service providers. Their Education Business Unit is currently deploying a safe, reliable, affordable internet access solution to schools in Atlanta, Georgia, funded through the FCC's Universal Services Fund program.

> *          *          *

> AGPI has designed and is implementing a fiber optic network in South America, the Caribbean, and Africa,

4

which will provide carriers with high quality transmission and advanced network capabilities. As a technology partner, Lynxus (www.lynxus.com) will provide strong infrastructure support, offering a full array of Internet solutions.

IPaxess, AGPI and Lynxus Inc. will work together to provide advanced, integrated IP remote access solutions for a number of global opportunities currently under development. AGPI will provide independent transport services. Lynxus will provide innovative applications services, and IPaxess will implement their patented VocalWare(TM) IP remote access solution.

Each press release concluded with a boilerplate cautionary statement:

This press release contains various "forward-looking statements" which represent the Company's expectations or beliefs concerning future events, including its belief regarding the impact on the Company of the new technology. These forward-looking statements involve numerous risks, uncertainties and assumptions, and actual results could differ materially from anticipated results. There can be no assurance as to the amount or timing of revenue from the new technology.

The deals described in these press releases failed quickly and spectacularly. Public statements by IPaxess trace the turn of events. The company shipped approximately $700,000 of Vocalware products and user licenses to Lynxus within three to four months of the May 25 announcements. While the company booked the revenue at the time of shipment, as was its custom, its auditors KPMG disputed this action, evidently because they were unpersuaded of Lynxus's ability to pay. On November 21, 2000, the company announced that it had acquiesced in KPMG's advice and withdrew the $700,000 from its revenue statement for the first quarter of 2001. Nevertheless, KPMG resigned from auditing IPaxess.

5

Having failed to receive even a dollar of the promised $25 million annual purchases from the AGPI/Lynxus association, or a dollar of the announced $6.5 million equipment purchase, or even a dollar of the $700,000 shipment (the products were eventually returned to IPaxess), the company publicly admitted the deals' collapse in February 2001. The company stated that it had "been able to maintain its connection to the Caribbean project," for which the products had been shipped. In a shareholder "letter" published on the company website about that time, McDonnell asserted that Lynxus had been unable to pay because one of its customers had delayed paying Lynxus. No mention was made that Lynxus had filed bankruptcy three weeks earlier.

**2. August 18 Press Release**

The August 18, 2000, press release announced, in a bold face subheading, that "Agreements Are in Place with Major Customers for Commercial Shipments in September 2000." In this release, IPaxess named several major companies including Time Warner Cable-San Antonio and Continental Airlines. The August 18 press release states as follows:

> IP AXESS(TM) Announces Closure of VocalWare(TM) IP Integrated Server Beta Program.
>
> Agreements in Place With Major Customers for Commercial Shipments In September, 2000.
>
> IP AXESS, formerly DATA RACE (Nasdaq: RACE), today announced that it has closed participation in the VocalWare IP integrated server beta program. Customers participating in the beta trial include Time Warner Cable

6

of San Antonio, Continental Airlines, Associated Global Partners/Lynxus, Inc., as well as a global carrier and an agency of the federal government. These first installations position IP AXESS to ship commercially available product in September 2000.

"The Enterprise Access Compact PCI Server is unparalleled in the scale, scope and flexibility of its design," said Michael McDonnell, IP AXESS's president and chief executive officer. "These organizations have established themselves as leaders in the application of remote access solutions and pioneers in the use of IP protocols to effectively converge voice and data connectivity. We are excited about our beta partners' remote access application plans and commencement of shipment of the Enterprise Access Server (2G) to partners of such distinction. We look forward to working closely with them as we begin implementation."

Plotkin alleges that this notice touted "agreements" that never existed. In any event, none of them ever generated ongoing business for IPaxess.

According to Plotkin's Complaint, the price of the company stock rose after the May 25 and August 18 press releases. Within a few months, however, after the revelation that the Lynxus revenue must be removed from the company's books, and after the publicized deals failed to come through, the stock sank steadily.

On May 11, 2001, the plaintiffs filed their initial seven-count federal complaint in Illinois against IPaxess, McDonnell, and Scogin, setting forth claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78j(b), and Securities Exchange Commission Rule 10b-5,

7

codified at 17 C.F.R. § 240.10b-5.[2]  Plotkin also alleged a common law fraud claim, along with a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act.  The case was transferred to the Eastern District of Texas.  The district court had to sever Plotkin's claims against IPaxess, which filed for Chapter 11 bankruptcy relief in July 2002.

The individual defendants, McDonnell and Scogin, moved to dismiss the Complaint for failure to state a claim upon which relief can be granted.  The Magistrate Judge to whom the motion was referred issued his first Report and Recommendation ("First Magistrate Report") recommending dismissal of the Complaint's federal claims.  He concluded that Plotkin failed to identify a factual basis that would make the three press releases false or misleading; failed adequately to allege scienter; failed to satisfy the pleading standards in the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78u-4 and 78u-5 (2000); and the statements in the releases were not actionable because they were forward-looking and accompanied by sufficient cautionary language. See 15 U.S.C. § 78u-5(c)(1)(A)("safe harbor").  In a second report, the Magistrate Judge recommended the dismissal of the state law causes of action for analogous reasons.  The district court adopted

---

[2]     The Complaint asserts that the individual defendants, McDonnell and Scogin, are liable because, throughout the Stock Purchase Period, each was a "controlling person" of IPaxess within the meaning of Section 20(a) of the Exchange Act.  Liability of the individual defendants is predicated, in part, on the actions of their company; thus, this opinion refers to the conduct of the company in issuing the press releases.

both reports without substantive comments, dismissed the federal and state law claims with prejudice, and rendered its final judgment. Plotkin has appealed.

## II. DISCUSSION

We review de novo the district court's dismissal of the securities fraud complaint against McDonnell and Scogin for failure to state a claim upon which relief can be granted. Rosenzweig v. Azurix Corp., 332 F.3d 854, 865 (5th Cir. 2003). In determining whether Plotkin has "stat[ed] a claim upon which relief can be granted," FED. R. CIV. P. 12(b)(6), we must accept the well-pleaded facts alleged in Plotkin's Complaint as true and construe the allegations in the light most favorable to Plotkin. Id. We do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions. Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 361 (5th Cir. 2004).

To demonstrate a violation of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, a securities fraud plaintiff must prove that the defendant made a (1) misstatement or omission (2) of material fact (3) in connection with the purchase or sale of a security, which was made (4) with scienter, and upon which (5) the plaintiffs justifiably relied, (6) proximately causing injury to the plaintiffs. Rosenzweig, 332 F.3d at 865. The Private Securities Litigation Reform Act ("PSLRA"), codified at 15 U.S.C. §§ 78u-4 and 78u-5, requires a securities

9

fraud plaintiff like Plotkin to plead these substantive elements with particularity.[3]  The PSLRA's particularity requirement incorporates, at a minimum, the pleading standard for fraud actions under Federal Rule of Civil Procedure 9(b).  <u>Rosenzweig</u>, 332 F.3d at 866.  In this court, the Rule 9(b) standards require specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation why they are fraudulent.  <u>Nathenson v. Zonagen</u>, 267 F.3d at 412 (citing <u>Williams v. WMX Technologies, Inc.</u>, 112 F.3d 175, 177 (5th Cir. 1997)).

---

[3]       The PSLRA speaks to the requirements of a securities law class action complaint as follows:

<u>(b) Requirements for securities fraud actions</u>
<u>(1) Misleading statements and omissions</u>
        In any private action arising under this chapter in which the plaintiff alleges that the defendant SS
        <u>(A)</u> made an untrue statement of a material fact; or
        <u>(B)</u> omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;  the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
<u>(2) Required state of mind</u>
        In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.
<u>(3) Motion to dismiss; stay of discovery</u>
<u>(A) Dismissal for failure to meet pleading requirements</u>
        In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.

15 U.S.C. § 78u-4(b).

10

The PSLRA pleading standard for scienter is especially challenging for plaintiffs. A valid complaint must plead specific facts giving rise to a "strong" inference of scienter. See U.S.C. § 78u-4(b)(1); Nathenson, 267 F.3d at 406-07 (5th Cir. 2001). The Fifth Circuit has elaborated that scienter generally encompasses severe recklessness. See Broad v. Rockwell Intern. Corp., 642 F.2d 929, 961-62 (5th Cir. 1981) (en banc). Thus, a securities fraud plaintiff must prove that the defendant either consciously misbehaved in issuing the releases, or was so severely reckless that it demonstrates that the defendant must have been aware of the danger of misleading the investing public. See Mercury Air Group, Inc. v. Mansour, 237 F.3d 542, 546 n.3 (5th Cir. 2001) ("[Scienter] encompasses reckless indifference such that the omission or misrepresentation was 'so obvious that the defendant must have been aware of it.'") (quoting Rubinstein v. Collins, 20 F.3d 160, 169 (5th Cir. 1994)); see also Southland Securities Corp., supra, 365 F.3d at 366.

1. **Alleged misstatements or omissions of the May 25, 2000, press releases.**

The Complaint adequately pleads that material omissions from the May 25 releases rendered those releases misleading. A fair reading of the May 25 press releases would reasonably induce investors to believe that IPaxess had a legitimate expectation of revenues from the agreements it had just struck with AGPI and Lynxus. The first May 25 press release states that "[t]he

11

agreement [strategic partnership with AGPI/Lynxus] calls for an annual commitment of $25 million dollars of net purchases from IPaxess." Likewise, the second release announced that IPaxess anticipated imminent revenue from these companies: "IPaxess . . . today announced receipt of a $6.5 million purchase order for the VocalWare IP remote work technology from AGPI/Lynxus, Inc." Considering that total revenues for IPaxess had been reported as $835,798 for fiscal 1999, and just over $300,000 in the year ended June 30, 2000, the announcement of these transactions would have been regarded by a reasonable investor as particularly significant.

A reasonable investor reading the releases would also have formed the impression that AGPI and Lynxus were significant international companies which could serve as credible business partners to IPaxess. Concerning AGPI, the releases state: "With current or developing operations in Latin America, Africa, Asia and the Middle East, AGPI is rapidly becoming a leading provider of telecommunications transport services." The releases describe Lynxus as "one of North America's fastest growing enhanced application providers."

These impressions were not dispelled by the press releases' standard warnings about the risks and uncertainties facing IPaxess as it started selling new products. Both releases included the warning: "There can be no assurance as to the amount or timing of revenue from the new technology." Although it is true that letters of intent and purchase orders do not necessarily

12

guarantee the receipt of cash, IPaxess's announcement of these agreements properly raised the inference that IPaxess expected its partners to perform under the agreements. The laudatory description of AGPI/Lynxus reinforced the expectation. The cautionary statements did not mention the potential uncertainty of AGPI's or Lynxus's ability to comply with the contracts.

The district court concluded, however, that Plotkin failed to plead facts permitting the inference that Lynxus/AGPI lacked the business potential to pay for the products they ordered. We disagree. The Complaint alleges that Lynxus was actually a very small company with reported revenues of $7 million in 1999 and that AGPI was incorporated, by Lynxus's CEO, less than six months before the news releases. The Complaint also states that Lynxus filed for bankruptcy on January 23, 2001, a mere eight months after the deals had been publicized. Further, by the time of the lawsuit, AGPI's status with the Georgia Secretary of State was "active/ noncompliance," i.e., that it had not filed a timely annual registration statement with accompanying minimal fee. The Complaint also alleges that within only three to four months of the May 25 press releases, KPMG, the company's auditors, disagreed so strongly over the company's desire to reflect as revenue a $700,000 shipment to Lynxus that, even after the company acquiesced in the auditors' caution and restated its revenue, KPMG resigned. The Complaint states that, contrary to the press releases, neither AGPI nor Lynxus engaged in the scope of operations attributed to it.

13

Although some of these allegations concern matters that transpired after the press releases, they are so temporally connected that they shed light on the financial condition of the companies at the time of the announcements and bolstered Plotkin's suspicion that, at the time AGPI and Lynxus entered into contracts with IPaxess, those companies could not perform their obligations. We subscribe to the rule that a "Plaintiff cannot charge Defendants with intentionally misleading their investors about facts Defendants may have become aware of after making allegedly misleading statements to the public." Lain v. Evans, 123 F. Supp. 2d 344, 350 (N.D. Tex 2000). Nevertheless, allegations of later-emerging facts can, in some circumstances, provide warrant for inferences about an earlier situation. For example, the fact that a business files for bankruptcy on "Day Two," may, under the right surrounding circumstances, provide grounds for inferring that the business was performing poorly on "Day One." See Novak v. Kasaks, 216 F.3d 300, 313 (2nd Cir. 2000) ("even six months after the Class Period, substantial amounts of 'Box and Hold' inventory still dated from 1993 and 1994 . . . supports the inference that inventory during the Class Period was similarly dated."). Further discovery may refute the inferences, but it is not unwarranted to infer that when a company's big deal collapses so fast, something was amiss at the outset.

The appellees, echoing the magistrate judge's analysis, contend that the press releases were neither false nor materially

14

misleading for several reasons. First, the negative facts that Plotkin points to about AGPI/Lynxus post-dated the press releases. As we have demonstrated, however, events following so closely on the heels of IPaxess's announcement of a major new business relationship and signed sales contracts cast doubt on the viability of those transactions from their inception.

Appellees also assert that generalized, positive statements about a company's prospects are not actionable under federal securities law. <u>Nathenson</u>, 267 F.3d at 419. This proposition, while true in isolation, overlooks not only that the announcement of signed, allegedly lucrative contracts is a statement of fact, not a generalized positive statement, but that, in context, the touting of AGPI/Lynxus was designed to create an impression that a substantial payoff would soon flow from the contracts.[4] The contextualized understanding of the positive statements about AGPI/Lynxus also defeats the defendants' contention that the negative information about those parties unearthed by Plotkin does not render the May 25 releases materially false or misleading. The average investor would certainly be surprised to learn that contrary to the depiction of AGPI/Lynxus in

---

[4] Defendants analogize Plotkin's criticism of the press releases to that of plaintiffs who charged that Azurix Corp., an Enron subsidiary, falsely failed to explain the risks of its worldwide water privatization investments. <u>See</u> <u>Rosenzweig</u>, 332 F.3d at 869. The difference is that Azurix at least conducted the business whose prospects it overestimated, while here, neither AGPI nor Lynxus appears to have done anything concrete from IPaxess's standpoint toward completing the contracts. The distinction is one of kind rather than of degree.

15

the press releases, the two companies were new, small and related to each other. Such characteristics would tend to undermine the investor's impression of the solidity of the new contracts and would imply instead that IPaxess had embarked on a speculative venture. The omission of those facts was material to a reasonable investor's appreciation of the implications of the deals for IPaxess's bottom line.[5]

Finally, while the defendants characterize some of the statements in these two releases as "forward-looking" and subject to the PSLRA's safe harbor provision because of the releases' cautionary language, they acknowledge that the facts concerning the contracts are not forward-looking predictions.[6] See Griffin v. GK Intelligent Systems, Inc., 87 F. Supp. 2d 684 (S.D. Tex. 1999) (holding that the defendant's announcement that it had entered into a three-year agreement from which it expected to realize $12 million in revenues referred to then-present factual conditions and thus did not fall within the safe-harbor provision of the PSLRA). Our analysis is independent of the statements contained in the

---

[5]    Defendants draw another false analogy with this court's decision in Southland Securities Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 361 (5th Cir. 2004), in which this court held that the description of a contract was not made misleading by the omission of the requirements of a payment bond and a three-stage implementation procedure.  Id. at 375 n. 15.  We pointed out, however, that the entire contract had been filed with the SEC, and added, "all without any apparent adverse effect on the stock price."  Id.  Here, by contrast, the press release acknowledging failure of the deals with AGNI/Lynxus precipitated, or at least foreshadowed, the end of IPaxess.

[6]    See 15 U.S.C. § 78u-5(i)(1)(A), (B), (C) (defining "forward-looking statements" as:  (i) projections of revenues, income, earnings, or other financial items, (ii) plans and objectives for future operations, and (iii) statements of future economic performance).

16

releases that are properly designated as forward-looking representations concerning IPaxess.[7]

### 2. Scienter allegations as to the May 25, 2000 press releases.

The district court concluded that Plotkin failed to plead facts giving rise to a strong inference of the defendants' fraudulent intent, as is required to state a claim under Rule 10b-5. We disagree. Plotkin alleged specific facts about the agreements giving rise to a strong inference that IPaxess knew or was severely reckless in not knowing at the time of the releases that Lynxus/AGNI were not able or were not likely to be able to make the payments they contracted to make. According to the Complaint, IPaxess was a struggling company that announced to the public that it had reached agreements with Lynxus and AGPI that would bring them multimillion dollar revenues, which would amount

---

[7] In their brief, the defendants identify several statements in the May 25 press releases which can be regarded as "forward looking":

"Ipaxess, AGPI and Lynxus Inc. will work together to provide advanced, integrated IP remote access solutions for a number of global opportunities currently under development . . . ."

"Going forward, this strategic relationship with AGPI/Lynxus represents an important component of IPaxess's worldwide distribution strategy. . . ."

"IPaxess is on the way to becoming a recognized leader in remote communications technology. . . ."

"These installations position IPaxess to ship commercially available product in September 2000."

"We look forward to working closely with them as we begin implementation."

(R. 1092-93, 1101-02).

17

to a thirty-fold increase from the revenues IPaxess reported in 1999. It is reasonable to assume, given the importance of these deals to the company, that IPaxess would have familiarized itself with the financial condition of Lynxus/AGNI and would have discovered details about their poor financial condition – including the facts that Lynxus earned revenues of $7 million in 1999, and that AGPI was incorporated less than six months prior to the issuance of the May 25 releases. Given the reasonableness of the inference that Plotkin possessed material facts casting doubt on its contracting partners' credibility, the district court was incorrect to fault Plotkin for failing to allege specific facts conclusively proving that IPaxess knew this information. Cf. Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000) (stating that an egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness).

Additionally, Plotkin alleges that IPaxess has referred in inconsistent ways to shipments of its product under the agreement, strengthening the permissible inference that IPaxess intended to deceive or mislead its investors. In its December 2001 Form 10-K annual report with the SEC, IPaxess referred to its agreements with Lynxus as "beta agreements" (a industry term referring to testing agreements where testers typically receive a temporary usage license): "From the beta agreements the Company shipped 35 VocalWare servers and 840 VocalWare user licenses for

18

approximately $701,000 [to Lynxus]."[8]  By contrast, when IPaxess

first announced the agreements in its May 25 releases, IPaxess

indicated that AGPI and Lynxus had ordered the products under

normal commercial sales terms:  "IPaxess, formerly DATA RACE, Inc.

(Nasdaq: RACE) today announced receipt of a $6.5 million purchase

order for the VocalWare IP remote work technology from

AGPI/Lynxus."  If IPaxess accurately stated in its later SEC filing

that the May 25 deal with AGPI/Lynxus was a beta agreement rather

than a normal commercial sale, then it is curious why this

seemingly important qualifying detail was omitted in the earlier

press release.[9]

### 3. Alleged misstatements or omissions of the August 18, 2000 press releases.

The district court concluded that Plotkin failed to plead

sufficient facts to illustrate that anything in the August 18 press

---

[8]      IPaxess's 2001 Annual Report on Form 10-K states:

The Company entered into beta program agreements with a major global carrier, a major cable provider, a major airline and an agency of the federal government for the VocalWare IP integrated server.  From the beta agreements the Company shipped 35 VocalWare servers and 840 VocalWare user licenses for approximately $701,000 and entered into an exclusive licensing rights agreement for approximately $365,000 with LYNUX [sic].  In January 2001, these servers were returned based on non-payment from LYNUX and the Company notified LYNUX that the exclusive licensing rights agreement had been terminated.  The Company in the quarter ended December 31, 2000 reversed the accounts receivable and deferred the revenue for approximately $365,000.

[9]      Because the district court ruled that no violation of Rule 10b-5 had been adequately pled, it further ruled that accordingly there could be no secondary liability of either of the individual defendants as "controlling persons" of IPaxess under § 20(b) of the Exchange Act, 15 U.S.C. § 78t(b).  Our reversal of this holding will require the court on remand to address the potential § 20(a) liability of McDonnell and Scogin in respect to the May 25 releases.

19

release was false or misleading. On this issue, we agree with the court.

Under Plotkin's reading, the August 18 release represented the statement that IPaxess had commercial sales agreements in place with Time Warner Cable of San Antonio, Continental Airlines, Associated Global Partners/Lynxus, Inc., a global carrier, and an agency of the federal government. Plotkin pleaded that this statement is an outright lie because no such commercial shipping agreements ever existed.

The defendants respond that Plotkin misinterpreted the August 18 press release and that, properly understood, it is correct in its particulars. According to the defendants, the press release does not announce commercial sales agreements, but, rather, refers to agreements for participation in IPaxess's beta trials, as part of its established marketing strategy. IPaxess's four-step selling strategy called for it to ship product to prospective customers on a trial basis and, if the customer decided to keep the product, to bill the customer after the trial period. Shipments to IPaxess's beta partners were, therefore, simply part of IPaxess's efforts to generate sales.

The press release expressly refers to beta agreements and does not announce the striking of commercial sales agreements with the listed companies. The release can only properly be read as telling investors that the participants in the beta test had been selected and that beta trials were ongoing. The announcement

20

advised the reader that IPaxess had "closed participation in the VocalWare IP integrated server beta program" (meaning that the selection of the participants had concluded) and lists customers "participating in the beta trial." Later, the release describes these organizations as beta partners: "We are excited about our beta partner's [sic] remote access application plans and commencement of shipment of the Enterprise Access Server (2G) to partners of such distinction."

The subheading of the release, which states: "Agreements in Place With Major Customers for Commercial Shipments in September, 2000," tends to suggest more than this. However, the text of the release does not reiterate or clarify what was meant in this subheading. Neither does the text of the press release announce, as Plotkin alleges, that IPaxess had binding contracts for commercial sales with Time Warner Cable-San Antonio and Continental Airlines as well as a global carrier and an agency of the federal government. Rather, the text of the press release repeatedly refers to the idea that these various organizations were participants in a beta program.

### 4.   Plotkin's state law claims.

In addition to his federal claims, Plotkin also asserts common law fraud and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act (the "Consumer Fraud Act"). In support of these state law causes of action, Plotkin relies on the

21

same allegations of fraudulent acts that support his federal securities claim. In opposition to these claims, IP Axess makes the same arguments it made against Plotkin's federal claims – that Plotkin's complaint fails to allege any fraudulent misrepresentations in conformity with Rule 9(b) of the Federal Rules of Civil Procedure.

Under Illinois common law fraud,[10] "although a statement may be technically true, it may nevertheless be fraudulent where it omits qualifying material since 'a half-truth is sometimes more misleading than an outright lie.'" Harwood v. Piser Memorial Chapels, 430 N.E.2d 553, 519 (Ill. App. Ct. 1981) (citing St. Joseph Hospital v. Corbetta Const. Co., Inc., 316 N.E.2d 51, 71 (Ill. App. Ct. 1974)). The Second Magistrate Report dismissed Plotkin's common law fraud claim based on its prior analysis that Plotkin failed to plead sufficient facts to warrant a finding that any of the press releases were false or misleading. (Second Magistrate Report at 1-2.) As discussed above, Plotkin has sufficiently pled that IP Axess's May 25 press releases were misleading. Thus, the district court erred in dismissing Plotkin's common law fraud claim on this basis. The defendant states no other basis for dismissal under Illinois law, so Plotkin states a

---

[10] Under Illinois law, the elements Plotkin needs to satisfy in order to establish common law fraud are: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." Connick v. Suzuki Motor Co., Ltd., 675 N.E.2d 584, 591 (Ill. 1997).

22

claim for Illinois common law fraud based on the allegations of misleading May 25 releases.

As for the Consumer Fraud Act claim,[11] the Second Magistrate Report dismissed it on the grounds that the May 25 statements Plotkin complains of are "statements pertaining to future events." (Second Magistrate Report at 4) (citing <u>Prime Leasing, Inc. v. Kendig</u>, 773 N.E. 2d 84, 92 (Ill. App. Ct. 2002)). We hold above that IP Axess's May 25 releases contained material statements of then-present factual conditions — transactions that had already occurred. To the extent described above, the district court erred in dismissing Plotkin's Consumer Fraud Act claim. The defendant's second ground for urging dismissal of the Consumer Fraud Act claim – that Plotkin has insufficiently alleged fraud with respect to the May 25 press releases – has also been rejected.[12]

### III. CONCLUSION

Plotkin has alleged a set of facts under which he could prove at trial his argument that the May 25 releases were

---

[11]    The elements of a claim under the Consumer Fraud Act are: (1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; (3) the occurrence of the deception in the course of conduct involving trade and commerce; and (4) actual damage to the plaintiff (5) proximately caused by the deception. <u>Oliveira v. Amoco Oil Co.</u>, 776 N.E.2d 151, 160 (2002).

[12]    The district court did not err, however, in dismissing the state law claims based on IP Axess's August 18 press release. As stated above, we agree that the press release could not properly be read in the manner urged by Plotkin.

23

deceptively selective disclosures, meeting the first element of a Rule 10b-5 claim (material misstatement or omission). Plotkin has also met his burden under Rule 12(b)(6) and the PSLRA by alleging specific facts about the May 25 agreements giving rise to a strong inference that IPaxess issued the May 25 press releases with scienter. The district court did not err in dismissing all claims against McDonnell and Scogin based on IPaxess's August 18 press release. Finally, the district court erred in dismissing the state law causes of action with respect to the May 25 press releases. We remand to the district court for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**